J-S29039-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD BOSSERT | : | |
| | : | |
| Appellant | : | No. 3060 EDA 2017 |

Appeal from the Judgment of Sentence September 6, 2017
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0002172-2012

BEFORE: PANELLA, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED MAY 30, 2018**

Appellant Richard Bossert appeals from the judgment of sentence entered in the Court of Common Pleas of Lehigh County on September 6, 2017, following the revocation of his probation. On appeal, Appellant contends the evidence was insufficient to sustain the revocation of his probation. After a careful review, we affirm.

The relevant facts and procedural history are as follows: On September 4, 2012, Appellant pled *nolo contendere* to terroristic threats, simple assault, and harassment.[1] On October 5, 2012, following a sentencing hearing, the trial court sentenced Appellant to 2½ years to 5 years in prison for terroristic

_____

[1] 18 Pa.C.S.A. §§ 2706(a)(1), 2701(a)(1), and 2709(a)(1), respectively.

_____

\* Former Justice specially assigned to the Superior Court.

threats, and a consecutive two-year period of probation for simple assault. No further penalty was imposed for harassment.[2]

On April 17, 2017, Appellant maxed out his prison sentence and began serving his probationary sentence. On July 28, 2017, the trial court issued a probation violation warrant for Appellant, and following a *Gagnon I*[3] hearing, the trial court ordered Appellant detained. Appellant, represented by counsel, proceeded to a *Gagnon II* hearing on September 6, 2017.

At the *Gagnon II* hearing, Probation Officer Kevin Chaundy testified that he began supervising Appellant in June of 2017, shortly after Appellant began serving his period of probation. N.T., 9/6/17, at 4. In June, on his own accord, Appellant went to an Allentown hospital, which transferred Appellant to Fairmont Behavioral Health in Philadelphia. *Id.* After Appellant left Fairmont Behavioral Health, he, on his own accord, went to St. Luke's Hospital for mental health treatment. *Id.* at 4-5, 6.

Probation Officer Chaundry testified as follows regarding Appellant's latest hospitalization:

_____

[2] Thereafter, Appellant did not file a direct appeal to this Court; however, he filed a collateral petition under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Following the appointment of counsel, the PCRA court denied the petition, and Appellant filed an appeal to this Court. We affirmed the denial of the PCRA petition on June 26, 2015. *See Commonwealth v. Bossert*, 2904 EDA 2014 (Pa.Super. filed 6/26/15) (unpublished memorandum).

[3] *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

On July 11th of [2017], [Appellant] entered, on his own, St. Luke's Hospital in Quakertown. He was there for three days. Upon his discharge, [the probation office] received a phone call from St. Luke's staff [indicating] that he was being discharged, but we were also informed that during his time there he had made several threats to staff and to a fellow patient[.]

*Id.* at 4. Probation Officer Chaundry testified that he filed a violation of probation petition against Appellant in response to the threat allegations. *Id.*

Judith Matusic testified that she is a behavioral health care manager at St. Luke's Hospital. *Id.* at 5. She testified that Appellant was admitted to the hospital on July 11, 2017. *Id.* at 7. During the first day of admission, when Ms. Matusic was interviewing Appellant, he threatened "a patient who was across the hall, [indicating] that he was going to kill him." *Id.* at 9. Ms. Matusic indicated Appellant mentioned the patient by name, and she opined that Appellant's demeanor was "serious," so she called a nurse to report to the room. *Id.* at 9-10. When the nurse came to the room, Appellant repeated that he was going to kill the patient across the hall. *Id.* Ms. Matusic noted that, although the floor on which Appellant was staying was a "locked unit," the individual rooms did not lock so Appellant had access to the patient simply by walking across the hall. *Id.* at 11.

Ms. Matusic testified that, in a different interview, Appellant indicated that he had guns, which a friend was holding for him, and he was going to get the guns and spray gunfire at everybody. *Id.* at 12. Ms. Matusic indicated that the statements were made in such a way that it was not a "joke." *Id.* at 14.

Ms. Matusic testified that, on July 14, 2017, Appellant indicated that he wanted to leave the hospital. *Id.* at 7-8. Ms. Matusic testified that the hospital's "hands [were] tied" once Appellant signed a "notice that he no longer wanted to stay in the hospital[,]" so plans were made to discharge Appellant. *Id.* at 7. However, during the discharge process, Appellant would not accept the hospital staff's assistance in sending him to a stable housing plan. *Id.* Ms. Matusic testified that Appellant informed her he was "homeless" and "just wanted to be discharged to the street[.]" *Id.* It was at this point that Ms. Matusic telephoned the probation office to inform them that Appellant was being discharged from the hospital with no assistance. *Id.* at 13. She also reported the threats at this time. *See id.*

Harvinder Singh, M.D., a psychiatrist at St. Luke's Hospital, testified that he was Appellant's treating physician while he was in the hospital from July 11-14, 2017. *Id.* at 23-24. Dr. Singh testified that the "main reasons for admission was worsening depression, increased irritability[,] and paranoid ideations that people are out to get him." *Id.*

He noted that, when Appellant was admitted, Appellant originally had another patient as a roommate. *Id.* at 27. However, Appellant demanded to change rooms. *Id.* Appellant then "targeted" this other patient and was "angry toward [the] one specific patient[.]" *Id.* Dr. Singh testified the other patient intruded into Appellant's room, and Appellant threatened to kill him. *Id.* at 26. He testified Appellant specifically stated, "He [(the other patient)]

- 4 -

is staring me down. He is always asking why other people get to do stuff. You will not be able to get me off of him and I am not going to just hurt him, I'm gonna murder him." *Id.* at 27.

When asked whether Appellant's statements regarding the other patient were the result of Appellant's mental illness, Dr. Singh testified:

> Based on my evaluation, I will not describe them as psychotic in nature because if someone is psychotic, they should be directed at everybody, not one specific peer.
> They were more planned in nature, so I will not describe them as related to unstable mood or due to psychosis.

*Id.* at 28.

Dr. Singh acknowledged that, in addition to threatening to kill a fellow patient, Appellant verbalized to the case manager that he had guns and was going to kill many people. *Id.* When asked whether Appellant made the latter statements as a result of "psychosis," Dr. Singh opined, "[B]ased on my evaluation of him, I saw there was reasoning—his presentation was of somebody who was more in control and making these decisions knowingly, so I will not describe them secondary to psychosis or unstable mood at this time." *Id.* at 28-29. He noted that Appellant made the statements because of anger. *Id.* at 31.

Dr. Singh noted that a patient who wishes to be discharged may be involuntarily committed for a period of time; however, Appellant was not showing behaviors that would have permitted such an involuntary commitment. *Id.* at 25. Instead, Dr. Singh opined Appellant was "angry that

he was there[.]" *Id.* As such, after Appellant signed the 24-hour form, he was discharged. *Id.* at 29.

Appellant informed the trial court that he went to the hospital voluntarily to receive treatment. *Id.* at 34-35. He admitted that he had "episodes" while he was in the hospital, but that he is "sick." *Id.* He indicated that his mental illness, and the fact he was in the hospital seeking help, should allow him to "speak [his] mind" without punishment. *Id.* at 35.

At the conclusion of the hearing, the trial court found Appellant in violation of his probation. Specifically, the trial court found Appellant violated the terms of his probation by failing to refrain from overt, threatening behavior. Thus, the trial court revoked Appellant's probation and sentenced him to 6 months to 24 months in prison. This timely, counseled appeal followed. All Pa.R.A.P. 1925 requirements have been met.

Appellant contends the evidence was insufficient to revoke his probation. While he admits that "he made threats against an individual and other generalized threats during his hospitalization[,]" he contends that the "threats were made. . .as a result of his psychiatric illness rather than any aggressive intent." Appellant's Brief at 9. He specifically argues that he did not intentionally, voluntarily, or knowingly violate his probation since the threatening statements at issue were the product of his severe mental illness. *See id.* 9-10, 12-13. Further, in this regard, he contends that, since he did not voluntarily and knowingly make the threatening statements, the evidence

does not sufficiently demonstrate that probation was an ineffective rehabilitation tool incapable of deterring him from future antisocial conduct. *See id.*

Relevantly, this Court has held the following:

> A challenge to the sufficiency of the evidence is a question of law subject to plenary review. We must determine whether the evidence admitted at [the hearing] and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all elements of the offenses. A reviewing court may not weigh the evidence or substitute its judgment for that of the trial court.

> Revocation of a probation sentence is a matter committed to the sound discretion of the trial court and that court's decision will not be disturbed on appeal in the absence of an error of law or an abuse of discretion. When assessing whether to revoke probation, the trial court must balance the interests of society in preventing future criminal conduct by the defendant against the possibility of rehabilitating the defendant outside of prison. In order to uphold a revocation of probation, the Commonwealth must show by a preponderance of the evidence that a defendant violated his probation. [T]he reason for revocation of probation need not necessarily be the commission of or conviction for subsequent criminal conduct. Rather, this Court has repeatedly acknowledged the very broad standard that sentencing courts must use in determining whether probation has been violated[.] A probation violation is established whenever it is shown that the conduct of the probationer indicates the probation has proven to have been an ineffective vehicle to accomplish rehabilitation and not sufficient to deter against future antisocial conduct.

> * * *

>> The burden of proof for establishing a violation of probation is a preponderance of the evidence, lesser than the burden in a criminal trial of proof beyond a reasonable doubt. But there are other noteworthy differences between a probation revocation hearing and a criminal trial, and the manner in which each proceeding affects the other also is significant:

> The focus [of] a probation hearing. . .is whether the conduct of the probationer indicates that the probation has proven to be an effective vehicle to accomplish rehabilitation and a sufficient deterrent against future anti-social conduct. It must be emphasized that a probation revocation hearing is not a trial: The court's purpose is not to determine whether the probationer committed a crime. . .The degree of proof necessary for probation revocation is less than that required to sustain a criminal conviction. Probation may be revoked on the basis of conduct which falls short of criminal conduct.

*Commonwealth v. Colon*, 102 A.3d 1033, 1041–42 (Pa.Super. 2014) (citations, quotations, and quotation marks omitted). As this Court has recognized, probation is a privilege, not an absolute right. *Commonwealth v. McNeil*, 665 A.2d 1247 (Pa.Super. 1995).

In the case *sub judice*, the trial court found credible Ms. Matusic's testimony that Appellant threatened to kill another patient at the hospital, as well as threatened to get a gun and shoot others. *See* Trial Court Opinion, filed 11/22/17, at 3. Although Appellant indicated at the *Gagnon II* hearing that his threatening statements were the product of his mental illness, the trial court found credible Dr. Singh's testimony that Appellant's threats were not related or secondary to psychosis or an unstable mood. *See id.* As the trial court found, Dr. Singh testified Appellant's threats were made in anger, "planned in nature," and the product of "reasoning" by "somebody who was [] in control and making [] decisions knowingly." *See id.*; N.T., 9/6/17, at 28-29, 31. We defer to the trial court's credibility determinations in this regard. *See Colon*, *supra*.

- 8 -

Accordingly, we find the trial court did not abuse its discretion in holding the Commonwealth proved, by a preponderance of the evidence, that Appellant's threats to kill a patient, as well as others, established that "probation has proven to have been an ineffective vehicle to accomplish rehabilitation and not sufficient to deter against future antisocial conduct." Trial Court Opinion, filed 11/22/17, at 2-3 (quotation and quotation marks omitted). Thus, the trial court did not err in revoking Appellant's probation. *See Colon*, *supra*.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/30/18